**RECORD NOS. 13-4472(L); 13-4473; 13-4474; 13-4532**

In The

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## MARK WILLIAM BAKER, a/k/a Lightning; DAVID CHANNING OILER, a/k/a Gravel Dave; BRUCE JAMES LONG, a/k/a Bruce Bruce; CARLOS HERNANDEZ,

*Defendants – Appellants*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT COLUMBIA

───────────

### BRIEF OF APPELLANTS

───────────

John D. Delgado
BLUESTEIN & NICHOLS, LLC
Post Office Box 7965
Columbia, South Carolina 29202
(803) 779-7599

*Counsel for Appellant Baker*

William M. Duncan
AUSTIN & ROGERS, PA
508 Hampton Street
Post Office Box 11716
Columbia, South Carolina 29201
(803) 256-4000

*Counsel for Appellant Oiler*

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, South Carolina 29606
(864) 760-4000

*Counsel for Appellant Long*

Cameron B. Littlejohn, Jr.
ATTORNEY AT LAW
1720 Main Street, Suite 202
Columbia, South Carolina 29201
(803) 799-1888

*Counsel for Appellant Hernandez*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

I.   STATEMENT OF SUBJECT MATTER AND APPELLATE
     JURISDICTION ...................................................................1

     A.   BASIS FOR SUBJECT MATTER JURISDICTION IN THE
          DISTRICT COURT ..........................................................1

     B.   BASIS FOR JURISDICTION IN THE COURT OF APPEALS .........3

II.  ISSUES PRESENTED FOR REVIEW ....................................5

III. STATEMENT OF THE CASE ...............................................6

IV.  SUMMARY OF THE ARGUMENT .......................................19

V.   ARGUMENT........................................................................21

     1.   APPELLANTS BAKER, OILER, AND LONG WERE
          ENTITLED TO A JURY INSTRUCTION ON
          ENTRAPMENT ..............................................................21

          Standard of Review ........................................................21

     2.   THERE WAS INSUFFICIENT EVIDENCE OF A PATTERN
          OR CONTINUITY TO SUPPORT A CONVICTION
          AGAINST APPELLANTS BAKER, OILER, AND LONG
          FOR CONSPIRACY TO COMMIT RICO VIOLATIONS ..............30

          Standard of Review ........................................................30

3.    THE DISTRICT COURT ERRED IN FAILING TO INSTRUCT THE JURY IN THE TRIAL OF APPELLANTS BAKER, OILER, AND LONG ON THE EXISTENCE OF MULTIPLE CONSPIRACIES ............................................44

     Standard of Review ..........................................44

4.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION OF DAVID OILER ON THE 924(c) COUNT OF THE SUPERSEDING INDICTMENT ..........................49

     Standard of Review ..........................................49

5.    THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO CONVICT APPELLANT BRUCE LONG OF TRANSFERRING A FIREARM FOR USE IN A CRIME OF VIOLENCE ..........................................54

     Standard of Review ..........................................54

6.    THE DISTRICT COURT COMMITTED ERROR IN ADDING 3 ADDITIONAL CRIMINAL HISTORY POINTS TO HERNANDEZ'S ADVISORY SENTENCING GUIDELINE CALCULATION AS THERE WAS INSUFFICIENT EVIDENCE TO CONNECT HERNANDEZ WITH THE CONSPIRACY PRIOR TO DECEMBER 31, 2011 ......56

     Standard of Review ..........................................56

VI.    CONCLUSION ..........................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................23

*Bryan v. United States*,
    524 U.S. 184 (1998)..................................................................55

*Concrete Pipe and Products of California, Inc. v.*
*Construction Laborers Pension Trust for Southern California*,
    508 U.S. 602 (1993)..................................................................22

*Curley v. United States*,
    160 F.2d 229 (D.C. Cir. 1947)...................................................23

*ePlus Technology, Inc. v. Aboud*,
    313 F.3d 166 (4th Cir. 2002) ....................................................41

*Hays v. Sullivan*,
    907 F.2d 1453 (4th Cir. 1990) ..................................................22

*H-J, Inc. v. Northwestern Bell Telephone Co.*,
    492 U.S. 229 (1989)...........................................................*passim*

*Salinas v. United States*,
    522 U.S. 52 (1997)....................................................................32

*Schuylkill and Dauphin Imp. Co. v. Munson*,
    81 U.S. 442 (1871)....................................................................23

*U.S. Airline Pilots Ass'n v. Awappa, LLC*,
    615 F.3d 312 (4th Cir. 2010) ...............................................41, 44

*United States v. Bartko*,
    728 F.3d 327 (4th Cir. 2013) ....................................................44

iii

*United States v. Bolden*,
   325 F.3d 471 (4th Cir. 2003) .........................................................................56

*United States v. Burgos*,
   94 F.3d 849 (4th Cir. 1996) ...........................................................................45

*United States v. Chase*,
   372 F.2d 453 (4th Cir. 1967) ...................................................................43, 45

*United States v. Crawford*,
   734 F.3d 339 (4th Cir. 2013) .........................................................................58

*United States v. Daniel*,
   3 F.3d 775 (4th Cir. 1993) .............................................................................21

*United States v. Devore*,
   423 F.2d 1069 (4th Cir. 1970) .......................................................................23

*United States v. Fiel*,
   35 F.3d 997 (4th Cir. 1994) ...........................................................................34

*United States v. Hackley*,
   662 F.3d 671 (4th Cir. 2011) ................................................................*passim*

*United States v. Hayes*,
   775 F.2d 1279 (4th Cir. 1985) .......................................................................43

*United States v. Hickman*,
   626 F.3d 756 (4th Cir. 2010) ...................................................................58, 59

*United States v. Kennedy*,
   32 F.3d 876 (4th Cir. 1994) .....................................................................48, 49

*United States v. Laughman*,
   618 F.2d 1067 (4th Cir. 1980) .......................................................................45

*United States v. Mouzone*,
   687 F.3d 207 (4th Cir. 2012) .........................................................................31

*United States v. Olano*,
  507 U.S. 725 (1993)..................................................................54

*United States v. Phan*,
  121 F.3d 149 (4th Cir. 1997) ..................................................22

*United States v. Reid*,
  523 F.3d 310 (4th Cir. 2008) ..................................................46

*United States v. Singh*,
  54 F.3d 1182 (4th Cir 1995) ..................................................56

*United States v. Smith*,
  451 F.3d 209 (4th Cir. 2006) ................................30, 49, 50

*United States v. Wallace*,
  515 F.3d 327 (4th Cir. 2008) ..................................................54

## STATUTES

18 U.S.C. § 2 ............................................................................1, 2

18 U.S.C. § 922(a)(1)(A) ..........................................................1

18 U.S.C. § 924(a)(1)(D) ..........................................................1

18 U.S.C. § 924(c) ...........................................................*passim*

18 U.S.C. § 924(h) .............................................................3, 55

18 U.S.C. § 1951 .......................................................................3

18 U.S.C. § 1956(a)(3)(B) ..............................................1, 2, 3

18 U.S.C. § 1961 .....................................................................32

18 U.S.C. § 1962(c) ..................................................................1

18 U.S.C. § 1962(d) ..................................................................1

18 U.S.C. §§ 3575, *et seq.*......................................................................33

18 U.S.C. § 3575(e) ................................................................................34

18 U.S.C. § 3661 .....................................................................................58

21 U.S.C. § 841(a)(1)........................................................................1, 2, 3

21 U.S.C. § 841(b)(1)(A) .......................................................................1, 2

21 U.S.C. § 841(b)(1)(B) .......................................................................2, 3

21 U.S.C. § 841(b)(1)(C) ....................................................................1, 2, 3

21 U.S.C. § 841(b)(1)(E) ..........................................................................1

21 U.S.C. § 841(b)(2)................................................................................1

21 U.S.C. § 846........................................................................1, 2, 3, 58

26 U.S.C. § 5845(a)(6)..............................................................................2

26 U.S.C. § 5845(a)(7)..............................................................................2

26 U.S.C. § 5861(d) ..................................................................................2

26 U.S.C. § 5871 ......................................................................................2

28 U.S.C. § 1291 ......................................................................................3

## RULE

Fed. R. Crim. P. 29............................................................................*passim*

**GUIDELINES**

U.S.S.G. § 4A1.2(e)(1) ...............................................................................56

U.S.S.G. § 6A1.3(a) ....................................................................................58

**OTHER AUTHORITIES**

*Merriam-Webster.com.* 2011.
http://www-merriam-webster.com (12 Jan. 2014).................................................22

## I.    STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

## A.    BASIS FOR SUBJECT MATTER JURISDICTION IN THE DISTRICT COURT

Appellants Mark Baker, David Oiler, Bruce Long, and Carlos Hernandez were among twenty defendants named in various counts of a 107-count Superseding Indictment filed by the United States Attorney's Office on September 19, 2012, in the District of South Carolina. (JA 162)

Mark Baker was named in Counts 1, 2, 3, 34, 35, 55, and 57. Count 1 alleged racketeering charges, in violation of 18 U.S.C. § 1962(c). Count Two alleged a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Count Three alleged a narcotics conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), 841(b)(1)(E), 841(b)(2), and 846. Count 34 alleged possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). Count 35 alleged possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Count 55 alleged money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). Count 57 alleged dealing firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), and 2.

David Oiler was named in Counts 1, 2, 3, 12, 13, 15, 16, 17, 18, 19, 20, 22, 23, 24, 36, 37, 50, and 84. Counts One, Two, and Three alleged racketeering,

racketeering conspiracy, and a narcotics conspiracy, pursuant to the code sections listed above. Count 12 alleged possession with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Counts 13 and 16 alleged possession with intent to distribute and distribution of 5 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Counts 15, 18, 20, and 23 alleged an attempt to possess with intent to distribute 500 gram or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, and 18 U.S.C. § 2. Counts 17, 19, 22, and 24 alleged possession with intent to distribute and distribution of 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. Count 36 alleged possession with intent to distribute a quantity of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Count 37 alleged possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c). Count 50 alleged money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). Count 84 alleged possession of an unregistered machine gun and silencer, in violation of 26 U.S.C. §§ 5861(d), 5845(a)(6), 5845(a)(7), and 5871.

Bruce Long was named in Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 14, 21, 44, 47, 49, and 70. Counts 1, 2, and 3 alleged racketeering, racketeering conspiracy, and a narcotics conspiracy, in violation of the code sections previously listed. Counts 5 – 11 and 14 alleged possession with intent to distribute and distribution of cocaine,

in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count 21 alleged an attempt to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Count 47 alleged conspiracy to commit an armed robbery, in violation of 18 U.S.C. § 1951. Count 47 alleged possession of a firearm in furtherance of a drug trafficking crime and a crime of violence, in violation of 18 U.S.C. § 924(c). Count 49 alleged money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B). Count 70 alleged the transfer of firearms knowing that the firearms would be used in a crime of violence, in violation of 18 U.S.C. § 924(h).

Carlos Hernandez was only named in Count 3 of the superseding indictment, the narcotics conspiracy.

Pursuant to all of the above-referenced code sections, the district court had proper jurisdiction over each of the Appellants.

## B.   BASIS FOR JURISDICTION IN THE COURT OF APPEALS

This Court has jurisdiction over appeals from final decisions of district courts pursuant to 28 U.S.C. § 1291. A verdict of guilty is a final decision under this statute.

Appellants Baker, Oiler, and Long were all sentenced on June 19, 2013, and a final judgment was filed in each of their cases the following day. (JA 31, DE 1434; JA 80-81, DE 1437; JA 125, DE 1430) Appellants Baker and Oiler both

filed notices of appeal on June 20, 2013. (JA 2334-2335) Appellant Long filed a notice of appeal on June 21, 2013. (JA 2336)

Appellant Hernandez was sentenced on July 10, 2013 and a final judgment in his case was filed by the district court on July 11, 2013. (JA 157, DE 1487) Hernandez filed a notice of appeal on July 11, 2013. (JA 2368)

Each Appellant filed a timely notice of appeal from a final decision of the district court. This Court has proper jurisdiction over this appeal.

## II.   ISSUES PRESENTED FOR REVIEW

1.   APPELLANTS BAKER, OILER, AND LONG WERE ENTITLED TO A JURY INSTRUCTION ON ENTRAPMENT.

2.   THERE WAS INSUFFICIENT EVIDENCE OF A PATTERN OR CONTINUITY TO SUPPORT A CONVICTION AGAINST APPELLANTS BAKER, OILER, AND LONG FOR CONSPIRACY TO COMMIT RICO VIOLATIONS.

3.   THE DISTRICT COURT ERRED IN FAILING TO INSTRUCT THE JURY IN THE TRIAL OF APPELLANTS BAKER, OILER, AND LONG ON THE EXISTENCE OF MULTIPLE CONSPIRACIES.

4.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO CONVICT APPELLANT DAVID OILER OF POSSESSION OF A GUN DURING A DRUG TRAFFICKING CRIME.

5.   THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO CONVICT APPELLANT BRUCE LONG OF TRANSFERRING A FIREARM FOR USE IN A CRIME OF VIOLENCE.

6.   THE DISTRICT COURT ERRED IN ADDING 3 ADDITIONAL CRIMINAL HISTORY POINTS TO APPELLANT HERNANDEZ'S ADVISORY SENTENCING GUIDELINE CALCULATION AS THERE WAS INSUFFICIENT EVIDENCE TO CONNECT HERNANDEZ WITH THE CONSPIRACY PRIOR TO DECEMBER 31, 2011.

### III.    STATEMENT OF THE CASE

In late 2008, Federal Bureau of Investigation agent Devon Mahoney was approached by some local law enforcement agents in the South Carolina area regarding an investigation into an outlaw motorcycle club called the Outlaws. (JA 265) The focus of the investigation was the alleged tension between the Outlaws Motorcycle Club and the Hells Angels Motorcycle Club. (JA 265) Despite the tension agent Mahoney testified to at trial, the lengthy course of this case would never reveal any actual conflict between the two motorcycle clubs in South Carolina. This is the most likely explanation for the fact the investigation did not discover any criminal activity and remained dormant for several years. It was not until the spring of 2011 that the FBI turned its attention back to the Hells Angels.

While the exact reason for the FBI's targeting of the Hells Angels was never made clear, the FBI ramped up its investigation of the Hells Angels through the use of a confidential informant named Joe Dillulio. (JA 265) The FBI was conducting surveillance when it noticed Dan "Diamond Dan" Bifield enter a jewelry store in Rock Hill, South Carolina, that was run by a large Italian man who would turn out to be Dillulio. (JA 265) Still claiming there was some type of tension between the Outlaws and the Hells Angels, the FBI enlisted the assistance of Joe Dillulio in finding out "what was going on with the Hells Angels." (JA 266) The FBI also claimed there were ongoing gun deals involving member of the Hells Angels,

though there was never any evidence presented at trial of criminal activity before the introduction of Dillulio. (JA 271)

After determining Dillulio was the man from the jewelry store, the FBI set out to determine whether he would be willing to act as a confidential informant. The FBI started investigating Dillulio by conducting two failed trash pulls. (JA 905) At that point, Agent Mahoney was still trying to determine what role Dillulio could play in the investigation of the Hells Angels. (JA 905)

Around this time, the York County Sheriff's Department served a search warrant on a jewelry store belonging to Dillulio's son. (JA 906) The police were using the search warrant in an attempt to locate a missing diamond ring. (JA 906) One of the officers serving the search warrant had been working on the Hells Angels investigation with Agent Mahoney and apparently recognized the connection between the search warrant and Dillulio. (JA 908) Mahoney was called and responded to the scene of the search warrant. (JA 908) Later that afternoon, he ended up talking to Dillulio. (JA 908) Mahoney falsely claimed to Dillulio that he had intervened to help Dillulio's son in the investigation into the missing diamond ring. (JA 910)

It was after the relationship with Dillulio began that the "South Carolina Hells Angels Task Force" was born. (JA 911) Dillulio would prove to be an industrious confidential informant. Throughout the investigation, Dillulio

7

possessed an audio recorder that he could turn on and off when he wanted to record various conversations. (JA 1210) There were also video cameras in Dillulio's store so federal agents could review the happenings inside the jewelry store. (JA 1210)

Dillulio began buying guns from Dan Bifield, who was getting them from another person. (JA 1212-13) He also began buying drugs from Lisa Bifield, the wife of Dan Bifield. (JA 1213) Dillulio's first interaction with any of the Appellants involved a loan of $10,000 from Bruce Long to help run Dillulio's jewelry store. (JA 330-31) Though the Government attempted to frame this loan as extortionate, it never presented any evidence that the loan was anything other than a regular loan. In fact, the evidence reflected the loan was an investment in Dillulio's gold and jewelry business. (JA 950)

Dillulio was initially paid on a per-deal basis. (JA 274) Perhaps sensing a larger opportunity with the government, he increased his deals with the Hells Angels and their associates, eventually earning a more regular position as a paid informant with a monthly salary. (JA 274-75)

A large portion of this case would turn on a sting created by the FBI. The story crafted by the FBI and relayed by Dillulio involved Dillulio purchasing guns and then claiming he was sending those guns to people in New York who were using the guns to rob drug dealers. (JA 270) The cash from the imaginary sale of the imaginary drugs from the imaginary robbery was then returned to Dillulio, who

claimed he needed to launder the money. (JA 270) Agent Mahoney testified one of the purposes of this particular sting was to determine the extent of the Hells Angels' gun dealing. (JA 271) However, the Government never presented any evidence of gun deals beyond the ones instigated by Dillulio.

On August 5, 2011, Dillulio obtained cocaine from Lisa Bifield at a bar in Lexington, South Carolina. Dillulio testified he saw Long's wife hand the cocaine to Lisa. (JA 1215) Long then entered the bar and had a conversation with Dillulio. (JA 1215) Dillulio purchased cocaine from Long seven additional times between August of 2011 and December 16, 2011, which was the last drug purchase from Long. In each purchase, Dillulio would inform Long of what he wanted to purchase and then Long would deliver the drugs. (JA 1382)

In addition to these cocaine transactions, Long sold two guns to Dillulio. (JA 1221) When Long brought the guns to Dillulio, Dillulio told him he planned to resell the guns to another party for a profit. (JA 1380-81) After the guns were sold to Dillulio, Dillulio made a reference to the fake robbery, though he offered no details. (JA 970) The reference to the robbery was made well after the guns were actually sold. Dillulio and Long had gone to lunch in between the sale and the reference to the robbery. There was no discussion of the robbery at lunch.

Dillulio also asked Long to assist with providing checks in exchange for gold or cash. The first conversation took place in reference to Dillulio needing

checks to buy gold, though he did not mention the gold was related to a robbery. (JA 956-57) Dillulio had not mentioned the fake robbery at this point. (JA 958) Dillulio later mentioned the robbery, but it was not clear that the gold deal he was discussing earlier was related to the robbery. (JA 1733)

During the conversation, it appears Long does not understand what Dillulio wants, as he mentions knowing a girl at a check cashing business. (JA 958) Dillulio then attempts to explain that he needs checks, not checks cashed. (JA 958-59)

Dillulio testified he later gave Long cash in exchange for checks. (JA 1222) At the end of November, Dillulio and an undercover federal agent met with Long to give him cash in exchange for checks. (JA 524) Dillulio did not discuss details of the money's source, nor did he mention a robbery, (JA 524)

The final interaction between Long and Dillulio was in February. There was no evidence Long and Dillulio communicated between December and February. On February 6, 2012, the FBI directed Dillulio to find out if Long could obtain a half kilogram of cocaine. (JA 698) The Government introduced a wiretap recording of Long talking to an unknown person about the drugs Dillulio had requested. (JA 701) Long did not obtain the cocaine and returned the money to Dillulio. (JA 705-06) There was no further contact between Long and Dillulio.

As Dillulio was ending his relationship with Long, he began making contact with Appellant David Oiler. (JA 542) On November 30, 2011, Dillulio and the undercover agent met with Oiler to provide Oiler with money to be exchanged for checks. (JA 543) Testimony reflected Dillulio had met Oiler at previous motorcycle club parties, though there was no mention of any previous illegal transactions with Oiler. (JA 544, 1000-01) At the meeting, Oiler was given a large amount of cash. (JA 548)

On December 7, 2011, Oiler returned to Dillulio's jewelry store and gave Dillulio checks in exchange for the cash. (JA 557) Dillulio also discussed a drug deal with Oiler. (JA 557) Several days later, Oiler delivered an ounce of cocaine to Dillulio. (JA 562) Dillulio and Oiler then discussed Dillulio buying larger amounts of cocaine. (JA 563-64)

On December 13, 2011, Dillulio and Oiler met to discuss a methamphetamine deal. (JA 571) Dillulio bought methamphetamine from Oiler on several subsequent occasions. Following the same pattern he used with Long, Dillulio would request methamphetamine from Oiler and Oiler would deliver it to Dillulio at his shop.

Dillulio also attempted to purchase cocaine from Oiler. (JA 596) Oiler was unable to obtain any cocaine and returned the money for the drugs to Dillulio. (JA 604) Dillulio met with Oiler again in January of 2012 to discuss obtaining larger

11

amounts of cocaine. (JA 608) Oiler was ultimately unsuccessful in obtaining any larger cocaine weight.

At a meeting on January 5, 2012, Oiler brought a gun to Dillulio. On an audio recording, Oiler described the gun as an automatic with a silencer. (JA 610) A videotape of the transaction reflected Dillulio's purchase of the gun and silencer from Oiler. (JA 611) After March 8, 2012, there was no more contact between Oiler and Dillulio. (JA 1010)

Dillulio's first substantial contact with Appellant Mark Baker would begin in January of 2012. (JA 637) At that meeting there was a discussion of money laundering. (JA 639) Dillulio was instructed by the FBI to meet with Baker to inform Baker of the dealings he had with other members of the Hells Angels and see if Baker would take money from Dillulio. (JA 640)

Baker and Dillulio met again on February 10, 2012. (JA 706) Dillulio was again instructed by the FBI to inform Baker of the deals he was conducting with others. (JA 720-21) Dillulio also met with Dan Bifield and Baker in a restaurant on February 27, 2012. (JA 740) He was instructed to discuss money laundering with them at the meeting. (JA 740)

Baker, along with Bifield, later met Dillulio on March 1, 2012, at Dillulio's store to receive money to be exchanged for checks. (JA 741) Baker later gave Dilluio checks in exchange for the cash. (JA 744-45) Bifield did not return any

12

checks and Dillulio called Baker to see if he could determine why Bifield had not returned the checks. (JA 752)

On May 22, 2012, Dillulio planned to meet with Baker to receive prescription pills. (JA 840) Dillulio was able to obtain the pills from Baker. (JA 846-47) It appears this was the last substantial contact between Dillulio and any of the Appellants.

On May 17, 2012, a sealed indictment was filed against the Appellants and a number of co-defendants by the United States Attorney's Office. (JA 7, DE 3) The indictment was unsealed June 7, 2012, and all four Appellants were arrested that same day. (JA 8, DE 77) Each Appellant was arraigned and pled not guilty. A superseding indictment was returned against all defendants on September 19, 2012. (JA 13, DE 571)

After a number of pretrial hearings, which are not at issue in this appeal, a jury was selected on January 24-25, 2013, for Appellants Baker, Oiler, and Long. Prior to the jury selection, the Government dismissed Count 44 of the Superseding Indictment against Appellant Long. (JA 115, DE 921)

The jury trial for Appellant Hernandez was severed and continued, due to his counsel's hospitalization. The jury trial for Appellants Baker, Oiler, and Long, along with co-defendants Don Boersma and Thomas Plyler, began on February 11, 2013. The general case against the Appellants is set out above, based primarily on

13

the testimony of FBI Agent Devon Mahoney and confidential informant Joe Dillulio. Further facts specific to each issue are described in the argument portions of this brief.

The Government rested its case on February 28, 2013. All of the Defendants at trial moved for a judgment of acquittal pursuant to Rule 29 on various counts of the indictment.

The district court reduced the cocaine weight attributable to Appellant Bruce Long from 5 kilograms or more to 500 grams to 5 kilograms of cocaine in relation to Count 3, the narcotics conspiracy. (JA 120, DE 1061) Long also moved for a judgment of acquittal on Count 47, for which Long was ultimately found not guilty.

A judgment of acquittal was granted on Count 36 against Appellant David Oiler. (JA 76, DE 1061)

Appellant Mark Baker moved for a judgment of acquittal on Counts 34, 35, and 57. Count 34 was a possession with intent to distribute methamphetamine for which Baker was ultimately found not guilty. Count 35 was for possession of a firearm in furtherance of a drug crime or a crime of violence, for which Baker was also found not guilty. A motion for a judgment of acquittal on Count 57, dealing firearms without a license, was also denied. However, Baker was also found not guilty on this count by the jury.

14

All Appellants moved for a judgment of acquittal on Counts 1 and 2. All three Appellants were found not guilty on Count 1, the RICO count. Count 2, the RICO conspiracy, is at issue in this appeal. However, the majority of the arguments made in support of a judgment of acquittal were the same for both counts. These arguments are further set out in the argument section of the brief, as the motion on Count 2 of the superseding indictment was denied by the district court. (JA 1586)

After the first phase of the trial concluded, the jury returned verdicts against the Appellants. Co-defendant Don Boersma was granted a judgment of acquittal after the Government rested and co-defendant Thomas Plyler was found not guilty on all counts, leaving only the Appellants.

All three Appellants were found not guilty on the Count 1, the RICO count. All three were found guilty on Counts 2 and 3, the RICO conspiracy and narcotics conspiracy counts. (JA 1906-09; 1911-15; 1921-25)

In addition to the conspiracy verdicts, Baker was found guilty on Count 55, the money laundering count. (JA 1910)

Oiler was found guilty on Counts 12, 13, 15-20, and 22-24, which all involved distribution or attempted distribution of narcotics. (JA 1916-1919) Oiler was also found guilty on: Count 37, possession of a firearm in furtherance of drug

trafficking; Count 50, money laundering; and Count 84, possession of a machine gun and silencer. (JA 1919-20)

Long was found guilty on Counts 5-11, 14, and 21, which all involved the distribution or attempted distribution of narcotics. (JA 1925-28) He was also found guilty on Count 49, money laundering and Count 70, transfer or a firearm for use in a crime of violence. (JA 1928-29)

The jury then deliberated on additional phases of the trial to determine drug weights and forfeiture issues. Those phases are not at issue in this appeal.

After the trial ended, Appellant Long filed a motion for a judgment of acquittal on Counts 2 and a portion of Count 3, the RICO and narcotics conspiracies. He also moved for a judgment of acquittal on Count 21, the attempt to possess cocaine. (JA 2305) All of his post-trial motions were denied. (JA 2333)

After the trial of Appellants Baker, Oiler, and Long, the jury trial for Appellant Hernandez began on March 25, 2013. The evidence presented by the Government during the Hernandez trial began in chronological sequence. The Government presented evidence of dealings between the informant Dillulio and Appellant David Oiler beginning in late November and early December, 2011. The evidence consisted of video and audio surveillance of meetings between Dillulio and Oiler along with recorded telephone conversations between them. In response to a question by the Assistant U.S. Attorney, Special Agent Mahoney testified that

he believed Oiler's "my guy" (or source of drugs) was co-defendant Kerry Chitwood. (JA 1987) During the course of an objection, the Court agreed that as of mid- December, 2011, that there was nothing implicating Hernandez in the conspiracy as of that point in the trial. (JA 1990)  However, Agent Mahoney offered his opinion that Hernandez was Chitwood's supplier during the course of his direct examination. (JA 1980, 1993)

The first intercept between Oiler and Chitwood did not take place until January 5, 2012. (JA 2000) The wire intercept on Chitwood's phone began on February 4, 2012. Prior to that date, there were no wiretap recordings of conversation by Hernandez. (JA 2077)

The Government called defendant Ron Byrum as a witness. Byrum testified that while he dealt drugs with Chitwood, his only contact with Hernandez was an unspecified occasion when he met Hernandez at Chitwood's house. (JA 2239-40, 2285)

Later in the Government's presentation, numerous telephone calls beginning in February, 2012, which were the subject of a court ordered wire intercept, were played that involved conversations between Chitwood and Hernandez. The meaning of these conversations were contested. However, the jury obviously found that they were substantial enough to implicate Hernandez in the conspiracy.

Hernandez's trial ended with a guilty verdict on Count 3 of the superseding indictment, the sole count against Hernandez.

Appellants Baker, Oiler, and Long were all sentenced on June 19, 2013. Baker was sentenced to 188 months incarceration. (JA 31, DE 1434) Oiler was sentenced to 200 months incarceration. (JA 80-81, DE 1437) Long was sentenced to 168 months incarceration. (JA 125, DE 1430) None of these three Appellants raise a challenge to their sentences.

Hernandez was sentenced on July 10, 2013. He received 262 months incarceration. (JA 157, DE 1487) Appellant Hernendez's sole issue on appeal relates to his sentence.

## IV.    SUMMARY OF THE ARGUMENT

There are six total issues raised for this Court's consideration.

Appellants Baker, Oiler, and Long, raise three consolidated issues. They argue that they each presented more than a scintilla of evidence of inducement by the Government to entrap them into the criminal activity for which they were convicted and the district court should have instructed the jury on entrapment.

Baker, Oiler, and Long also argue there was insufficient evidence of a conspiracy to commit RICO and they should have been granted a judgment of acquittal pursuant to Rule 29. The argument is based on the lack of pattern and continuity as required by the RICO statute. There was no arranging factor to order the criminal activity in this case as required for conviction. Because of the insubstantial period of time the activity spanned, the Government's control over the criminal activity, and the lack of a general pattern, the district court should have granted a judgment of acquittal.

Baker, Oiler, and Long additionally raise the refusal of the district court to instruct the jury on multiple conspiracies. Because the Government proved a series of individual, unconnected conspiracies, there was a material variance between the proof at trial and the indictment. The Appellants suffered substantial prejudice from the failure to give this jury instruction.

Appellant David Oiler individually raises a challenge to the sufficiency of the evidence on his conviction for possession of a gun during a drug trafficking crime. Oiler argues that there was no evidence he possessed a gun in relation to his drug-related activities and should have been granted a judgment of acquittal.

Appellant Bruce Long individually raises the argument there was insufficient evidence to support his conviction for transferring a firearm knowing it would be used in a crime of violence or drug trafficking crime. Long argues there was no evidence in the record he knew what the gun he sold was to be used for and should not have been convicted of that count. Because he failed to move for a judgment of acquittal, Long argues this lack of evidence was a plain error and the conviction should be reversed.

Appellant Carlos Hernandez's sole issue on appeal raises a challenge to his sentence only. He argues that he received three additional criminal history points based on a prior conviction that was outside of the fifteen-year period for counting a prior conviction in his criminal history category. Because there was no evidence he was involved in the conspiracy count for which he was convicted prior to December 31, 2012, he should not have received the additional criminal history points.

## V.    ARGUMENT

1.    APPELLANTS BAKER, OILER, AND LONG WERE ENTITLED TO A JURY INSTRUCTION ON ENTRAPMENT.

**Standard of Review:** A district court's denial of a jury instruction on entrapment is reviewed de novo. *United States v. Hackley*, 662 F.3d 671, 681 (4th Cir. 2011).

It is well-settled that entrapment entails two elements: (1) inducement; and (2) the defendant's lack of predisposition to commit the crime. *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993). The district court recognized there was some question as to what burden each party had in proving entrapment. Because of this uncertainty, the district court did not consider the existence of any predisposition. (JA 1636) The district court only placed a burden on Appellants Baker, Oiler, and Long to provide more than a scintilla of evidence regarding inducement. The district court found none of these three Appellants were entitled to an instruction on entrapment. Because predisposition was not considered in the district court, this argument focuses on the requirement of producing evidence of inducement by a Government agent.

As a general rule, a defendant is entitled to a jury instruction on any recognized defense for which there is sufficient evidence for a jury to find in his favor on the asserted defense. *Hackley*, 662 F.3d at 681. The defendant merely needs to produce more than a scintilla of evidence of inducement to receive a jury

instruction on entrapment. *United States v. Phan*, 121 F.3d 149, 154 (4th Cir. 1997). While the requirement of more than a scintilla of evidence is very clear under this Circuit's authority, the meaning of "more than a scintilla" is less clear.

The dictionary definition of scintilla is a very small amount; a spark or a trace. "scintilla." *Merriam-Webster.com.* 2011. http://www-merriam-webster.com (12 January 2014). By extension, requiring more than a scintilla would merely require more than a trace of evidence. This Court defined "more than a scintilla" as less than a preponderance of evidence, drawing a comparison to the same evidence required to justify refusal to grant a directed verdict in a jury trial. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The preponderance of evidence standard simply requires the trier of fact to believe the existence of a fact is more probable than not. *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 622 (1993). Even a slight tipping of the scale towards the probability of a fact is sufficient to meet the burden of preponderance of evidence. Based on this reasoning, more than a scintilla of evidence merely requires existence of the evidence. A "spark" or "trace" of evidence would be insufficient, while anything more would meet the burden of "more than a scintilla." The burden is not high; it can be met even when the proof is improbable.

22

This burden of proof is in line with the historical power of the jury. Juries should retain the power to make decisions on the facts of a case. Discussing a jury's right to consider a criminal case and the district court's right to direct a verdict, the United States Supreme Court has recognized the jury's right to determine credibility, weigh evidence, and make its own decision on the inferences of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986)(quoting *Curley v. United States*, 160 F.2d 229, 232-233 (D.C. Cir. 1947)). It has long been recognized that a preliminary question should not be determined by a judge when there is any evidence to support the proponent's position. *Schuylkill and Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871). A scintilla of evidence is the suggestion of a fact without support; more than a scintilla of evidence is merely the suggestion of a fact with some support.

Turning to the facts of this case with that reasoning in mind, Appellants Baker, Oiler, and Long each presented more than a scintilla of evidence of inducement by the Government. The Appellants were not required to testify to meet their burden. It was proper for the Appellants to show some indication they were corrupted by Government agents even through the Government's witnesses. *United States v. Devore*, 423 F.2d 1069, 1071 (4th Cir. 1970).

Appellant Mark Baker requested an entrapment charge based on Dillulio's knowledge of Baker's desperate financial condition. (JA 1636) Baker argued the

Government was aware of his financial condition prior to and during the dealings initiated by Dillulio. (JA 1637) The inducement used by Dillulio for Baker, as with the rest of the Appellants, was money.

Dillulio sequentially ingratiated himself to the targets of the investigation as the investigation progressed. He had no real contact with Baker until January 18, 2012, which was nearly six months after Dillulio became involved with this investigation. (JA 1041) Prior to this contact, there was no information Baker had been involved in any of the deals Dillulio had been conducting. At the January 18 meeting, Dillulio told Baker he did not believe Baker was aware of Dillulio's dealings with members of the Hells Angels and their associates. (JA 1694) When Dillulio asked Baker if he received any financial benefit from the deals, Baker said he had not. (JA 1694) It does not appear Baker ever asked for any financial benefit.

Dillulio was the one who initiated the financial dealings with Baker, repeatedly telling him he deserved "tribute", as the "boss." (JA 1698) Importantly, it was Dillulio that first broached the subject of Baker receiving some financial benefit from the deals Dillulio was engaged in with others. Without being asked, Dillulio just began giving Baker money. No criminal activity on Baker's part took place until Dillulio had set the financial hook and began reeling Baker in with larger and larger financial inducements.

During cross-examination of Agent Mahoney, Baker discussed his bank records, which had been subpoenaed by the FBI. (JA 1046) Baker pointed out his bank records reflected insufficient funds notices during the time Dillulio was approaching him, January through March of 2012, regarding various financial activities which would ultimately form the basis for this prosecution. (JA 1047)

Baker also called his mother, Feroline Loren, as a witness during the trial. She testified she had been paying Baker's bills and assisting him with his financial problems for several years. (JA 1602) Loren also described Baker's lack of work during and after the recession that hit in 2007. (JA 1602-03) She was responsible for almost all of his bills during a significant time period. (JA 1607)

Dillulio had become aware throughout the course of this investigation he was dealing with targets who had little to no financial means. A common theme of his discussions would be the incredible amounts of money he had access to. His method would remain similar throughout the investigation. As he targeted various individuals, he would create some financial relationship with each individual. Dillulio often started small or just gave away money. As the relationships grew, he would then introduce larger and larger schemes, which often lacked an air of believability. What was believable, however, was the cash he was spreading around.

Baker specifically never actually engaged in direct illegal dealings with Dillulio. His only substantive action was to exchange cash for checks. As with most of Dillulio's schemes, the only facts that made this financial transaction illegal were Dillulio's tales of a robbery. Between his gold investments, out of state contacts, and other tales, it is understandably unclear how believable any of his stories actually were.

Appellant David Oiler requested an entrapment charge based on both Oiler's reluctance to become involved with Dillulio and the financial inducement provided by Dillulio. (JA 1644-45)

The FBI was unaware of Oiler at the beginning of the investigation. (JA 996) The FBI became aware of Oiler only after the investigation began. Because he had no prior criminal history, Agent Mahoney only learned who Oiler was as the investigation progressed. (JA 997) October 12, 2011, was the first date on which Dillulio had any real contact with Oiler. (JA 1000) This meeting took place at a party, but there was never an allegation it involved any illegal dealings. (JA 1388)

On November 30, 2011, Oiler went to Dillulio's jewelry shop for the first time. (JA 1388-89) At that meeting, Dillulio told Oiler he had just completed a deal involving nearly half a million dollars. (JA 1390) Dillulio agreed this was a large enticement to Oiler. (JA 1391) He also agreed that he repeatedly shifted his

identity to empathize with whoever he was dealing with at the time, stating "[w]hen in Rome, you do as the Romans do." (JA 1399) Dillulio agreed that he did and said whatever he had to do to entice the targets of the investigation to do what the FBI wanted in order to make their case. (JA 1400)

Oiler, like the rest of the Appellants, did not begin his dealings with Dillulio by approaching Dillulio and engaging him in criminal activity. Following the pattern Dillulio would develop throughout this case, he approached Oiler and began building a relationship. Dillulio dangled a large amount of money in front of Oiler and used that money to induce his participation in subsequent criminal capers. Oiler, like the rest of the Appellants, had no prior criminal history nor was there information he was involved in criminal activity prior to the time Dillulio induced his criminal acts. It was Dillulio that created and executed the criminal activity in this case.

Appellant Bruce Long also met his burden to present more than a scintilla of evidence of entrapment. At no point in the trial did the Government ever present evidence Long dealt drugs to anyone besides Dillulio. In his testimony, Dillulio described his repeated and devastating financial problems that occurred before and up to the time he met with Dan Bifield, the first Hells Angels member he came into contact with in this case. Dillulio initially had serious heart problems upon his move to South Carolina from New York. (JA 1194) He then suffered a series of

27

burglaries at his jewelry stores that further contributed to his financial issues. (JA 1195) Dillulio also blamed the sad state of the economy for his continuing financial issues. (JA 1198)

Around this time, Dillulio first met Dan Bifield. (JA 1200) Dillulio testified he played up his mafia connections and projected a "tough-guy" image because he viewed Dan Bifield as an enemy. (JA 1201-1203) Despite his claim that Dan Bifield was an enemy, it was Bifield Dillulio turned to for rescue from Dillulio's various financial shenanigans.

In late 2010, Dillulio obtained a loan from Bifield. (JA 1204) Dillulio clearly knew that the actual loan came from Bruce Long, despite Dillulio's efforts at trial to confuse that issue. Under cross-examination, he stated he did not know if Long provided all of the money for the loan, though he then immediately stated that he was aware it was Long that provided all of the money for the loan. (JA 1368)

This loan became a central issue at the trial for Long, as nearly every aspect of the loan was in dispute, other than the fact it was made. Both the FBI and Dillulio attempted to frame the loan as extortionate. It may have been, but it was not Long, or even Bifield, engaging in any extortion. Rather, it was Dillulio who used the loan as an inducement. He had Long at his mercy until he elected to pay back the loan.

As with the others, Dilluio used a financial inducement to keep Long dealing with him. He had already borrowed money from Long because he was going broke in his business. After creating this relationship, he began using this influence in his dealings with Long.

The district court accepted the Government's argument there was no inducement of any of these Appellants. In making this ruling, the court disregarded the repeated stories told by Dillulio suggesting he had unlimited amounts of money at his disposal and would allow the Appellants to share in it. Each of these Appellants had a serious financial reason to become involved with Dillulio. On the other hand, none of these Appellants had a history of prior involvement in criminal activity. The Government presented no evidence of prior dealings or dealings going on with someone besides Dillulio. It is clear that Dillulio was in charge of the criminal activity in this case and used financial pressure to reel the Appellants into his dealings.

The Appellants have shown more than a scintilla of evidence of inducement. The burden is not high. It is more than a suggestion; there must be some fact to support the argument there was inducement. In fact, this Court has found that "thin" evidence of a conspiracy met the requirement of substantial evidence in a case that represented the "lower boundary" of what this Circuit will accept as substantive evidence of a conspiracy. *United States v. Hackley*, 662 F.3d 671, 675

& 678 (4th Cir. 2011). Even less evidence can support a jury instruction on entrapment.

The district court is not required to accept the evidence, or even be swayed by it at all. The evidence just has to exist. When its existence arises, as it did in this case, the district court is required to place the factual decision with the proper entity: a jury of the Appellants' peers. The jury was denied the opportunity to consider this defense, which was reversible error. The convictions of Appellants Baker, Oiler, and Long should be reversed on this ground.

2.    THERE WAS INSUFFICIENT EVIDENCE OF A PATTERN OR CONTINUITY TO SUPPORT A CONVICTION AGAINST APPELLANTS BAKER, OILER, AND LONG FOR CONSPIRACY TO COMMIT RICO VIOLATIONS.

**Standard of Review:**    Appellants Baker, Oiler, and Long each made a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The decision to deny a Rule 29 motion for a judgment of acquittal is reviewed by this Court de novo. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). The Court views the evidence in the light most favorable to the Government and should only sustain the verdict if the verdict is supported by "substantial evidence." *Id.* "Substantial evidence" is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

Appellants Baker, Oiler, and Long were all charged with both RICO violations and conspiracy to commit RICO violations in Counts One and Two, respectively, of the superseding indictment. (JA 162-191) They were all acquitted of the substantive RICO violations by the jury. (JA 1906; 1911; 1921)

RICO and conspiracy to commit RICO contain identical elements; the difference is that a RICO conspiracy allows conviction when the defendant meets all the elements of a RICO violation, but has merely conspired to commit racketeering acts, rather than actually committing the acts. In this case, the Government did not prove any of the Appellants conspired to commit any acts in violation of RICO. Even where the Government may have proven predicate acts in this case, there was never sufficient proof those acts would form the basis for a RICO violation. The jury agreed with this as to Count 1, finding predicate acts were committed, but failing to find a RICO violation.

The RICO conspiracy statute does not criminalize association with an enterprise; it requires the knowing and intentional agreement to participate with another in an act that, if completed, would constitute a substantive RICO violation. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Just like the substantive charge, all elements of a RICO violation must be met.

The basis of the Appellants' request for a judgment of acquittal was the Government's failure to prove the pattern element of the RICO charges. (JA 1620)

31

Appellants Baker, Oiler, and Long made the same argument; the Government proved nothing more at trial than a series of unrelated, unorganized criminal acts that posed no threat of future reoccurrence. The district court denied the motions. (JA 1586)

The RICO statute has three essential elements: (1) conduct of an enterprise; (2) existence of an enterprise; and, (3) a pattern of racketeering activity. *Salinas v. United States*, 522 U.S. 52, 62 (1997). "Pattern" is defined as at least two acts of racketeering activity. *Id.* Though the statute requires two acts, the courts have developed a requirement beyond just two racketeering acts.

The pattern element of a RICO violation has been the subject of much consideration in both the Supreme Court and the Courts of Appeals. In *H-J, Inc. v. Northwestern Bell Telephone Co.*, the Supreme Court addressed the pattern element of a RICO claim. *H-J, Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). The Supreme Court recognized that Congress intended a commonsense approach to the pattern element, as the RICO statute has an inherent flexibility that has been left to the courts to define. *Id.* at 237. The defining portion of the RICO statute does little to define a pattern of racketeering activity; it merely sets out a minimum necessary condition for the existence of a pattern of racketeering activity. *Id.*; 18 U.S.C. § 1961.

The requirement of two predicate acts is necessary for a RICO conviction, but the existence of two acts is not by itself sufficient to sustain a RICO conviction. *H-J, Inc.*, 492 U.S. at 237. A RICO pattern requires something beyond simply the number of predicate acts. *Id.* at 238. The courts have been left to define this requirement, as the statute contains no guidance as to establishing the existence of a RICO pattern. *Id.*

The Supreme Court extensively analyzed the element of a pattern in *H-J, Inc*. The Court started with the common dictionary definition of a pattern: an "arrangement or order of things or activity." *Id.* The number of predicates is not a guarantee of a pattern. *Id.* The predicates must relate to each other or to some external organizing principle. *Id.* There must be both this relationship and a threat of continuing criminal activity. *Id.* at 239. This combination is referred to as "continuity plus relationship." *Id.*

*H-J, Inc.* discussed the element of relatedness by taking guidance from Congress's definition of relationship in the Organized Crime Control Act of 1970. *Id.* In Title X of the Dangerous Special Offender Sentencing Act, 18 U.S.C. §§ 3575, *et seq.*, relationship of criminal acts is defined as follows: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are

33

interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, quoting 18 U.S.C. § 3575(e)(now partially repealed).

While the Government presented evidence of criminal acts on the part of the Appellants, it failed to show a sufficient relationship between both those criminal acts and the alleged enterprise. Considering a similar claim of related racketeering activity, this Court discussed an example of drug dealing activity related to an enterprise.

In *United States v. Fiel*, this Court set out a number of factors relating criminal activity to an enterprise. *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). Finding a relationship between a motorcycle club and the criminal acts of its members, this Court noted: (1) discount drug prices for member-to-member deals; (2) public parties that facilitated drug sales; (3) approval of drug use in connection with club meetings; (4) control over drug sales by club officers; (5) loans from the club treasury for the purchase of drugs; and (6) all defendants either bought or sold drugs in connection with their motorcycle club. *Id.*

In *Fiel*, there was sufficient evidence to relate the criminal acts to each other. Rather than simple association between club members, there was a clear connection between the club's drug dealing activities and the club itself. The relationship was established by showing that the club was intimately involved with, and could not be separated from, the drug dealing activity.

The instant case presents a far different picture and a much more tenuous relationship, if any, between alleged criminal acts and the Appellants. Each alleged criminal act was unrelated to the other criminal acts. In fact, the only organizing principle of these criminal acts was the Government's agent, Joe Dillulio.

Chronologically, Bruce Long's involvement with Dillulio was described through testimony earliest. The first allegation of criminal activity against Long was an August 5, 2011 drug deal in which Dillulio received drugs from Lisa Bifield. (JA 1214) Dillulio claimed he observed Long's wife, Somying Anderson, pass something to Lisa Bifield. (JA 1215) Later that night, Lisa delivered cocaine to Dillulio. The Government alleged Long was the actual supplier of these drugs, and the jury convicted him of this act. (JA 1215)

After August 5, 2011, the Government alleged eight additional drug deals between Long and Dillulio. There was one additional deal in August (JA 1219), two deals in September (JA 437-439; 426-433), one deal in October (JA 483-492), two deals in November (JA 495-498; 528-530), and one deal in December (JA 587-589). Nearly two months after the final deal in December, Dillulio asked Long to obtain a larger amount of cocaine (half a kilogram) which he was unable to obtain. (JA 1219-1220) After the February contact, there were no further deals between Long and Dillulio.

More importantly, this was the entirety of the drug dealing activity proven against Long during the course of the trial. There was no evidence of any deals prior to the August 5 incident. There were no deals between August 5 and February 6 from Long to anyone besides Dillulio. After February 6, there were no further deals by Long to anyone.

After the August 5 incident, each deal followed a similar pattern. Dillulio would call Long or meet with Long and request that Long obtain drugs for him. While the Government alleged the Bifields were involved in these deals, there was little, if any, evidence that either of the Bifields had a hand in the drug deals between Long and Dillulio. Even in the light most favorable to the Government, there was only slight evidence that the Bifields may have been involved in the first two deals, which took place in August. There is absolutely no evidence the Bifields, or any other indicted or unindicted associate of Long, were involved in the deals subsequent to August 30.

Dillulio was the controlling factor in each of the deals with Long. He set the price and the amount requested, as well as all of the details involving the delivery. At no point did anyone besides Long ever become involved in these deals. The deals were solely between Long and Dillulio. The money to finance these deals did not originate with the Hells Angels or any of the people involved in this case; it all

came from the Government through Joe Dillulio. These facts would apply to all of Dillulio's deals with the Appellants.

On the other end of the deals, there was no evidence that the drugs were coming from any member of the Hells Angels, any person associated with the Hells Angels, or anyone indicted in this case. The Government never presented any evidence of who was supplying the drugs Long obtained. This was most likely the result of the Government's failure to look for any criminal activity beyond that of the Hells Angels Motorcycle Club or its associates.

Each drug deal in this case took place independently of any other activity. There was no connection between the deals and any other person or any other organizing principle, other than the involvement of Joe Dillulio.

The money laundering allegation was even more isolated. The scheme originated when Dillulio approached Long about helping convert money to checks. (JA 1728-33) There was an initial conversation about the money, and then no mention of it for several months. When the scheme finally came to fruition, Dillulio gave Long cash to deposit in his bank account. (JA 527-28) Several days later, Long returned the money in the form of a check. (JA 537) There were only two parties involved in the transaction: Bruce Long and Joe Dillulio. The money laundering activity was isolated and sporadic. It was not linked to any larger scheme, other than the one created by Dillulio. There was no allegation that any

other parties were involved or benefited from the money laundering transaction between Long and Dillulio.

The final act alleged by the Government in support of a RICO conspiracy was a fake robbery described by Dillulio. The evidence of Long's involvement in this scheme was the weakest of all of the evidence presented by the Government. In fact, the Government dismissed a count of attempted robbery against Long before the trial began. (JA 113, DE 921)

The attempted robbery was a sting story created by the FBI for Dillulio's use in the course of this investigation. Dillulio spun the tale that he had a crew in New York robbing drug dealers and selling the drugs in Canada. He was then supposed to get the money and convert it to checks. (JA 270)

Dillulio told different stories regarding this robbery on a number of occasions. The only link between Long and the robbery was the allegation Long provided guns for use in the robbery. However, the evidence clearly reflected that Dillulio did not mention the robbery in relation to the guns he was obtaining from Long other than a passing reference hours after the guns were actually transferred. (JA 966-970) Again, Long's involvement in the robbery was slight and isolated. There was no agreement between Long and anyone besides Dillulio regarding the robbery. As with the other acts discussed here, Dillulio is the only thing close to an organizing factor. There was no agreement with anyone else that served to connect

the criminal acts to some external factor. Such a factor was required to order or arrange the acts for a RICO pattern.

The criminal acts alleged against Oiler did not begin until November 30, 2011. Prior to that date, there was no evidence Oiler was involved in any criminal activity. (JA 1000) On November 30, Dillulio engaged Oiler in his fake money laundering scheme. (JA 543) The activity followed the same pattern described earlier; Dillulio provided Oiler with cash and several days later Oiler provided a check in exchange for the cash. (JA 550) Around the same time, Oiler began dealing drugs with Dillulio.

Oiler's dealings with Dillulio would follow the same pattern as Dillulio's dealings with Long, though Oiler was often unable to provide the drugs requested by Dillulio. On December 9, 2011, Dillulio obtained cocaine from Oiler. (JA 562) On December 13, 2011, Oiler provided meth to Dillulio. (JA 571-72) On December 22, 2011, Dillulio requested a large amount of cocaine, which Oiler was unable to provide. (JA 596; 604-05) Oiler then obtained meth for Dillulio on December 23, 2011, and January 10, 2012. (JA 596; 621-22) He attempted to obtain cocaine on January 18, 2012, and was unsuccessful. (JA 671) On January 31, 2012, Oiler obtained meth for Dillulio but was unsuccessful in providing cocaine requested by Dillulio. (JA 680-81) He obtained meth again for Dillulio on February 14, 2012. (JA 727-29) Oiler was unable to obtain cocaine for Dillulio on

March 1, 2012. (JA 761) His final deal with Dillulio was providing Dillulio meth on March 8, 2012. (JA 784-85) Though there was a minute amount of meth found on June 7 at his arrest, the district court granted a judgment of acquittal on this count and it did not remain an issue at trial.

Oiler's dealings were, like Long's, isolated from anyone else in this case. They were unrelated to the Hells Angels or the other people charged in the RICO conspiracy count. Like Long, there was only one common factor in these deals: Joe Dillulio. There was no other organizing factor in Oiler's dealings. Like Long, there was no other evidence of prior dealing or continued dealing by Oiler. Also like Long, Oiler was unable to obtain the larger amounts of cocaine requested by Dillulio.

The evidence against Baker was extremely limited. He was acquitted on the only drug and gun counts against him. The drug count resulted from a small amount of meth found at his arrest. The dates of the acquitted gun count covered a long period, over which the jury found insufficient proof of possession. There was no proof of Baker providing guns to Dillulio or dealing in guns with Dillulio.

The money laundering count against Baker was identical to the counts against Oiler and Long, though it took place months after their money laundering activity. (JA 744-45) Again, there was no organizing factor related to this activity

sufficient to support the relatedness element of a RICO conspiracy. As with Long and Oiler, only one factor connected Baker's activities to this case: Joe Dillulio.

In addition to the failure to show a relationship between these acts other than Dillulio's instigation, there was insufficient evidence of a threat of repeated activity to sustain a RICO conviction. The threat of repeated criminal activity is critical to the continuity element of a RICO case. Continuity requires either a closed period of repeated or past criminal conduct that threatens to project into the future. *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002).

Closed-ended continuity requires a series of related predicates that take place over a substantial period of time. *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010). In a case with a built-in ending point, closed-ended continuity is all that can be proved. *Id.*

Open-ended continuity requires a clear threat of repetition; there must be facts that support a reasonable expectation that racketeering activity will extend indefinitely into the future. *Id.* There is no bright-line rule for determining whether there is a threat of continued racketeering activity. The existence of a threat will turn on the specific facts of each case. *Id.*

In either case, closed-ended or open-ended, continuity is centrally a temporal concept. *H-J, Inc.*, 492 U.S. at 241-242. Predicate acts taking place over a period of a few weeks or months will rarely satisfy the requirement of a substantial period

of time. *Id.* at 242. But, like open-ended continuity cases, the threat of continuity is always the determining factor in a RICO case.

The glaring problem with the proof of continuity in this case appears regardless of whether the Government frames its case as a closed-ended or open-ended case of continuity; the proof at trial produced no threat of continued criminal activity. Under a closed-ended analysis, there was no substantial period of time for any individual Appellant, or the entire proven set of acts. Long was involved in criminal acts for approximately six months. Oiler was involved in criminal acts for approximately three and a half months. Baker's involvement in actual criminal activity seems to span less than a few weeks. Even considering all of the activity proven by the Government, and giving the Government every benefit of the doubt, the span of criminal activity lasted for less than a year.

The most liberal time span that can be covered in this case reveals no evidence of criminal activity going on outside of dealings with government agent Joe Dillulio. Dillulio was the organizing factor for all criminal acts that took place during the course of this case. In each instance, he instigated the activity, set the details of the activity, and continued the activity. Without the instigation, involvement, and direction of Dillulio, there was simply no independent criminal activity. It is well-settled that, because at all times relevant to the proof Dillulio

was a government agent, he cannot be a co-conspirator for purposes of proving this case. *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011).

A government agent can never be a co-conspirator. *United States v. Hayes*, 775 F.2d 1279, 1283 (4th Cir. 1985). This Court has long held that one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator. *United States v. Chase*, 372 F.2d 453, 459 (4th Cir. 1967). This rule is grounded in common sense. Allowing a government agent to enter a conspiracy and then convict a defendant for that agreement creates a terrifying situation. The Government becomes the controlling factor in the illegal agreement. The Government can instigate conduct that would otherwise never happen. This type of activity would call into question the very integrity of a criminal investigation and prosecution; without the government agent, would there have ever been an agreement to commit a crime?

That very question infects this entire case. In each instance of wrongdoing, Joe Dillulio was the central player in the act. Not a drug was dealt that he did not instigate. Not a dollar was laundered other than at his direction. No gun was provided unless Dillulio asked for it.

Though there can be no RICO charge without a pattern of crimes, a RICO charge is not suited to all crimes, even when there are multiple criminal acts. "[RICO] is a unique cause of action concerned with eradicating organized, long-

term, habitual criminal activity." *U.S. Airline Pilots Ass'n*, 615 F.3d at 317. By its very purpose, RICO is intended to address a long-term pattern or criminal activity that poses a danger above and beyond typical criminal acts. When long-term or habitual criminal activity is identified, RICO is an appropriate weapon to address such activity. No long-term or habitual criminal activity was found or proven in this case. Rather, a RICO conspiracy was created out of whole cloth by an FBI agent and his *agent provocateur*.

Faced with a failure of proof of the "relationship plus continuity" required for a RICO case, the district court should have granted a judgment of acquittal for Appellants Baker, Oiler, and Long on Count Two of the superseding indictment.

3. THE DISTRICT COURT ERRED IN FAILING TO INSTRUCT THE JURY IN THE TRIAL OF APPELLANTS BAKER, OILER, AND LONG ON THE EXISTENCE OF MULTIPLE CONSPIRACIES.

**Standard of Review:** The failure to give a multiple conspiracies instruction is reversible error only when the failure to give such an instruction causes substantial prejudice to the defendant. *United States v. Bartko*, 728 F.3d 327, 344 (4th Cir. 2013).

Appellants Baker, Oiler, and Long, requested a jury charge on multiple conspiracies with regards to Count 3, the narcotics conspiracy, which was denied by the district court. (JA 1660) This request was based on the lack of coordination or agreement between various groups of people that were dealing drugs. (JA 1662)

44

The gravamen of the crime of conspiracy is an agreement to commit a criminal act. *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir. 1980). Appellants acknowledge that a conspiracy does not have to be organized, executed with precision, or meet any other particular structural requirements. *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996). While there is no particular formality required to prove a conspiracy, a knowing and voluntary agreement is an essential element of a conspiracy. *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011).

In this case, the Government did not prove a single overarching conspiracy as the law requires. Rather, it proved a series of unconnected relationships with one thing in common: Joe Dillulio. The only agreements reached were between Appellants and Dillulio. As discussed earlier, Dillulio cannot be a co-conspirator. *Chase*, 372 F.2d at 459.

There were three sets of activity presented at trial in this matter. Again, these actions are best considered chronologically, as the flaw in the Government's theory is revealed when the acts are considered temporally.

Appellant Bruce Long was accused of actual cocaine deals spanning from August to December, 2012. He was also accused of money laundering and supplying a gun for a fake robbery during that time period. There was an attempt to

45

obtain cocaine in February of 2012. None of these acts had any connection to Appellants Baker or Oiler.

All of the substantive drug counts involved Long delivering cocaine to Dillulio. In the light most favorable to the Government, there may have been evidence the Bifields and Long's wife were involved in one or two of the early deals, but that evidence was scant. Even assuming they were involved in the first two drug deals that would have resulted in a conspiracy between those individuals, but not Baker or Oiler.

The majority of the deals between Long and Dillulio took place without the involvement of any other parties. The supplier of the drugs to Long was never identified. This Court has held that evidence of a buy-sell relationship, coupled with large quantities of drugs and repeated transactions may provide reasonable evidence of an agreement. *Hackley*, 662 F.3d at 679.

In holding that evidence of large quantities of drugs and repeated transactions was sufficient evidence of a conspiracy, this Court has considered testimony that suggested a defendant supplied a group of repeat customers. *United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008). However, in *Reid*, the testimony involved the defendant and others. *Id.* In the instant case, there was testimony that Long supplied Dillulio on multiple occasions. However, there was no evidence that Long supplied anyone else. More importantly, the deals between Long and Dillulio

46

were isolated from the deals Dillulio conducted with others. There was no interaction related to the drug dealing between Long and Baker or Oiler.

The money laundering and robbery allegations were also isolated from the other Appellants. These were independent deals between Long and Dillulio. To the extent there was any agreement, it stopped with Dillulio. There was no evidence Long had agreed with someone connected to Baker or Oiler to carry out any of the acts.

As the deals with Long ended, Dillulio began dealing with Oiler, as described earlier in the brief. Those deals were entirely unconnected to Long or Baker. They represented independent actions of Oiler, rather than any agreement between Oiler and the other Appellants. Again, the only connector between Oiler and Long or Baker was Dillulio, who could not be a co-conspirator.

Baker's actions were even more isolated from the others. There was little proof he had any involvement with drugs at all. There was no evidence of any agreement between him and Long or Oiler. In fact, there was hardly any evidence of him contacting either one of them. Again, only Dillulio served as any connecting factor between the Appellants.

The district court noted that the Appellants were looking at the conspiracy from the point of view of drug deliveries. (JA 1663) The court stated that the Government was also including the money laundering allegations. (JA 1663)

However, the money laundering was conducted by Dillulio on an individual basis with each of his targets.

Agent Mahoney conceded on cross-examination that Dillulio often told targets of the investigation not to tell others what they were doing. (JA 960) He was keeping the targets separate. (JA 960) Agent Mahoney claimed this was to sound more realistic and that Dillulio often told targets about deals with other targets. (JA 961) While that may have been a sound investigative strategy, Dillulio's role as a government agent prevented him from creating an actual conspiracy.

The essential requirement of an agreement was hamstrung by Dillulio. He entered into a number of individual agreements with others. However, there were no agreements between those others that could then independently serve to form an agreement. With Joe Dillulio as the connecting factor in a series of individual agreements, the proof of one overarching conspiracy failed.

The failure to give a multiple conspiracy instruction prejudiced the substantial rights of Appellants Baker, Oiler, and Long and constitutes reversible error. A defendant in a conspiracy case can show the existence of a material variance from the allegations in the indictment by showing that the government proved multiple, separate conspiracies. *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994). The danger in this situation exists from the possibility the jury may

transfer evidence of one conspiracy against a defendant to another defendant, resulting in an unfair verdict. *Id.*

The Government presented a large amount of evidence in this case of drug deals between Dillulio and numerous individuals. Because none of the evidence ultimately linked Baker, Oiler, and Long, the evidence showed the existence of multiple unrelated conspiracies.

Appellants Baker, Oiler, and Long were entitled to a jury instruction on multiple conspiracies to avoid the prejudice created by the various separate dealings of Dillulio and numerous targets. Because the district court failed to give this instruction and the Appellants suffered substantial prejudice from that failure, the Appellants' conviction on Count Three should be reversed.

4.  THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION OF DAVID OILER ON THE 924(c) COUNT OF THE SUPERSEDING INDICTMENT.

**Standard of Review:** Appellant David Oiler made a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The decision to deny a Rule 29 motion for a judgment of acquittal is reviewed by this Court de novo. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). The Court views the evidence in the light most favorable to the Government and should only sustain the verdict if the verdict is supported by "substantial evidence." *Id.* "Substantial evidence" is defined as "evidence that a reasonable finder of fact

could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

At the Rule 29 stage of the trial, counsel for David Oiler moved for a judgment of acquittal on the two counts of the Superseding Indictment that were added following the arrest of Mr. Oiler on June 7, 2012: Counts 36 and 37. Count 36 charged Oiler with possession with intent to distribute methamphetamine based on the small amount of methamphetamine found at his residence on the date of his arrest. The evidence was undisputed that at the time Oiler was arrested, his girlfriend was present at the residence; it was further undisputed that a co-Defendant Richard Thrower was living at the residence that was leased to David Oiler at Walkabout Lane in Lancaster, South Carolina. (JA 1559-60) There were three firearms seized from Mr. Oiler's residence at the time he was arrested. (JA 1553-54) Defense counsel argued and the Court agreed that the small amount of methamphetamine, a user quantity, found in Oiler's room was not consistent with the distribution of methamphetamine. (JA 76, DE 1060, 1061) As discussed in an earlier portion of this brief, the evidence presented by the Government regarding the distribution of methamphetamine by Mr. Oiler to confidential informant Joe Dilullio was that ounce quantities were delivered by Mr. Oiler to Dilullio. The Government also emphasized the high level of purity of the methamphetamine delivered by Oiler to Dilullio on each occasion (greater than ninety percent pure).

50

The user quantity found on June 7, 2012 at Walkabout Lane was not exceptionally pure. Other than the mere presence of the small amount of methamphetamine on Mr. Oiler's actual possession (or at least his constructive possession of the drugs found in his home) on June 7th, there was no evidence to suggest he was going to distribute that illegal drug. Therefore, the Court granted defense's Rule 29 motion and dismissed Count 36 of the Superseding Indictment.

Defense counsel moved for the dismissal of count 37 on the same basis. That count charged Mr. Oiler with a violation of 18 U.S.C. § 924(c) for possession of a firearm in furtherance of drug trafficking. The Government argued that the 924(c) charge was not entirely based on the methamphetamine found at Oiler's residence on June 7th in close proximity to several firearms but conceded that the 924(c) charge did stem partially from the search of the residence.

In fact, the Superseding Indictment was returned by the Grand Jury on September 19, 2012. A number of Counts were added to the Indictment that had been returned in May 2012. In the initial Indictment, Mr. Oiler was charged in sixteen counts based on conduct that occurred prior to May 2012. The Superseding Indictment added two Counts; Count 36 and Count 37 which followed the arrest of David Oiler on June 7, 2012. (JA 208) It is inaccurate for the Government to claim that Count 37 was not based on the methamphetamines and firearms found at Oiler's residence on June 7th. All other evidence regarding Mr. Oiler's delivery of

methamphetamine and cocaine to Dilullio concluded by March 8, 2012, more than two months before the Grand Jury returned the initial Indictment. If the evidence existed to charge David Oiler with a violation of 924(c), it would have been presented to the Grand Jury at the time of the initial Indictment. Mr. Oiler's phone calls were intercepted for sixty (60) days from early January 2012 through early March 2012. (JA 1006-07) There was video footage and audio recordings of David Oiler on several occasions at Dilullio's place of business. That video and audio at Dilullio's store formed the basis for the sixteen counts charged against David Oiler in the initial Indictment.

The Government contends that there was a single instance at the end of a lengthy meeting at Dilullio's store in which Oiler allegedly said "I've got a gun" as he is departing. (JA 1888) Defense counsel submits that the audio is somewhat garbled and Mr. Oiler may have said "I've got to go" as he was leaving the store. In any event, that single reference to a gun at Dilullio's store, when Oiler was not in possession of any illegal substance, is not sufficient to sustain the conviction on the 924(c) charge.

The particular problem with Count 37 remaining in the Superseding Indictment for the jury to consider was that there was overwhelming evidence of the actual distribution/delivery of methamphetamine by Mr. Oiler to Dilullio. Counsel strongly argues that Oiler was entrapped by the Government and that he

was not a part of any conspiracy (either RICO or drug conspiracy) as charged by the Government. However, as the jury was not given an instruction on entrapment (reversible error by the District Judge) as to Mr. Oiler, there was simply no defense to the distribution counts regarding methamphetamine. Also, without an entrapment instruction, there was no defense to the sale of a machine gun as charged in Count 84 of the Superseding Indictment. Mr. Oiler delivered that machine gun to Dilullio on January 5, 2012, as charged in both the original and superseding indictment.

In the seven distribution counts (methamphetamine and cocaine) and the four counts of attempted distribution (cocaine) charged against Mr. Oiler, there was no evidence presented that he was in possession of a firearm. Mr. Oiler had no prior criminal record so it was legal for him to own and possess firearms. He did own and possess several firearms at his residence and those were discovered by law enforcement during the search incident to his arrest as testified to by Agent Chris Garrett. (JA 1553-54) Absent the small amount of methamphetamine found by law enforcement on June 7th, there would not have been a Count 37 of the Superseding Indictment. The court properly granted a judgment of acquittal on Count 36 and should have granted a judgment of acquittal on Count 37. Appellant David Oiler respectfully requests that this Court overturn his conviction on Count 37 as it is not supported by the evidence.

5.    THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO CONVICT APPELLANT BRUCE LONG OF TRANSFERRING A FIREARM FOR USE IN A CRIME OF VIOLENCE.

**Standard of Review:** Long's counsel failed to move for a judgment of acquittal on Count 70 of the indictment. Because of this, the Court reviews this issue for plain error. *United States v. Wallace*, 515 F.3d 327, 331 (4th Cir. 2008). Plain error requires the following findings: (1) there must be an error; (2) the error must be obvious or clear under current law; (3) the error must affect substantial rights. *Id.*, citing *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

There was a lack of evidence to support Appellant Long's conviction for transferring a firearm for use in a crime of violence. Long did not dispute at trial that he sold an SKS rifle and a pistol to Dillulio. The subject of the sale was broached on September 20, 2011, when Dillulio told Long he was interested in buying a gun from Long. (JA 1768) Dillulio had initially asked for an AK-47 rifle, but Long informed him he had an SKS, rather than an AK-47. (JA 966)

Dillulio offered Long a $200 profit on the rifle. (JA 967) Dillulio bought the rifle from Long and paid him for it. (JA 968) There was no discussion prior to the sale of the rifle regarding its intended purpose. After the sale was made, Long and Dillulio went to lunch. Upon returning from lunch, Dillulio made a passing reference to the fake robbery scheme in New York. (JA 970) There was no detailed

conversation about using the gun in the robbery. Dillulio did not inform Long the gun was to be used in any crime.

Long was convicted of a statute requiring a knowing transfer of a firearm "knowing that such firearm will be used to commit a crime of violence…or drug trafficking crime…" 18 U.S.C. § 924(h). The term "knowing" is used twice in the statute. There is no question that "knowing" in this context refers to knowledge of the facts which will give rise to the violation. *Bryan v. United States*, 524 U.S. 184, 192-193 (1998). Long was required to know that the gun was to be used in the robbery. There was no evidence he knew what this gun would be used for prior to the actual transfer of the gun.

This lack of evidence is glaring and clear. While counsel should have moved for a judgment of acquittal, the conviction can be overturned even under the plain error standard. There was absolutely no evidence Long had knowledge of the gun's intended use.

This lack of evidence warrants a judgment of acquittal under the law. A Rule 29 judgment of acquittal was undoubtedly warranted in this matter. Long's substantial rights were affected by suffering conviction for a crime of which he is innocent. Appellant Long has met the plain error standard and his conviction on Count 70 should be reversed.

6.  THE DISTRICT COURT COMMITTED ERROR IN ADDING 3 ADDITIONAL CRIMINAL HISTORY POINTS TO HERNANDEZ'S ADVISORY SENTENCING GUIDELINE CALCULATION AS THERE WAS INSUFFICIENT EVIDENCE TO CONNECT HERNANDEZ WITH THE CONSPIRACY PRIOR TO DECEMBER 31, 2011.

**Standard of Review:** In assessing a sentencing Court's application of the Guidelines, the Appeals Court reviews factual determinations for clear error and legal issues *de novo. U.S. v. Singh*, 54 F.3d 1182 (4th Cir 1995); *U.S. v. Bolden*, 325 F.3d 471 (4th Cir. 2003)

As indicated in paragraph 82 of the presentence investigation report, Hernandez was convicted on October 24, 1989, of criminal sexual conduct 3rd degree in the Court of General Sessions for York County, South Carolina. (JA 2561-62) He was subsequently released on parole in 1992, but his parole was revoked in 1996. (JA 2562) Hernandez was eventually released from custody on this charge on December 31, 1996. (JA 2562) As this was a crime for which the maximum term of imprisonment exceeded one year and one month, the applicable time period for counting this conviction for purpose of criminal history points is 15 years. Including the period of incarceration on this sentence, the 15 year period expired on December 31, 2011. U.S.S.G. § 4A1.2(e)(1).

The counting of this conviction placed Hernandez at adjusted offense level 36, criminal history category 4. Were this conviction not counted, he would be at

56

adjusted offense level 36, criminal history category 3 with a sentencing range of 235-293 months.

The evidence presented by the Government (outlined above) shows that Hernandez was not even identified by the FBI until 2012. The record is void of any mention of Hernandez having willfully joined or participated in the charged conspiracy before 2012. Prior to December 31, 2011, there is no proof of an act or a conversation which links him to the conspiratorial plot.

The probation officer in the initial presentence investigation report makes numerous assumptions that there is evidence connecting co-defendant Chitwood and Hernandez with drug transactions before January 1, 2012.  He presumes that the telephone connections indicated by the telephone toll records had involved conversations where "Chitwood would contact Hernandez to obtain the drug amounts requested by Oiler…" These telephone toll records were used as evidence by the USPO to prove Hernandez supplied Chitwood, who then supplied Oiler with quantities of cocaine, crystal methamphetamine ("ICE") and/or methamphetamine for distribution purposes. (JA 2543)

In response to Hernandez's objections, the probation officer, in his addendum, reiterated his assumption that certain words were used during telephone conversations without anything other than toll records. (JA 2580-81)

A review of co-defendant Ron Byrum's testimony shows that Byrum met Hernandez at Chitwood's house, and that was the extent of his knowledge concerning Hernandez. (JA 2239; 2389) In denying Hernandez's objection to the inclusion of the three criminal history points, the district court followed the assumptions propounded by the probation officer and stated that these assumptions were corroborated by the testimony of Byrum. (JA 2344-45)

The district courts are given wide latitude in the types of information they may use in determining and imposing sentences. 18 U.S.C. § 3661; U.S.S.G. § 6A1.3(a); cf. *United States v. Crawford*, 734 F.3d 339 (4th Cir. 2013). This Court has required a sentencing judge to rely on information that has sufficient indicia of reliability to support the information's probable accuracy. *Crawford*, 734 F.3d at 342. This Court has also discussed the elements of a conspiracy to distribute narcotics under 21 U.S.C. § 846, to wit:

> (1)    An agreement between two or more persons to engage in conduct that violates a federal drug law;
>
> (2)    The defendant's knowledge of the conspiracy; and
>
> (3)    The defendant's knowing and voluntary participation in the conspiracy.

*United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010).

The court in *Hickman* stated that proof of the conspiratorial agreement need not be by direct evidence, and rather may "be proven inferentially and by circumstantial evidence." 626 F.3d at 763.

While these elements were presented to the jury in the context of Hernandez's conversations in 2012, proof of these elements did not exist prior to December 31, 2011. The rules of admissibility are relaxed at sentencing, but in this case there was only a scintilla of evidence to consider. That evidence basically involved:

(1)    Telephone toll records (JA 2291) that show numerous phone calls between Chitwood and Oiler, also Chitwood and Hernandez.  There is no content in the record of anything that was discussed during these calls in December, 2011;

(2)    The testimony of Ron Byrum in which he testified that he met Hernandez one time at Chitwood's house, but never testified as to any drug dealings or drug knowledge on the part of Hernandez; and

(3)    The opinion of the case agent which could only be accurately based on the two items above.

Hernandez's argument is not based on the admissibility or weight of evidence to involve him in the conspiracy as of December, 2011. The argument is that there is no evidence to make him a knowing member of the conspiracy during that time period. Without any evidence, the district court should not have included the 1989 conviction in determining the advisory sentencing guidelines for Hernandez.

The sentencing of Hernandez should be vacated and the case remanded for a new sentencing hearing.

## VI.    CONCLUSION

For the reasons argued in this brief, Appellants Baker, Oiler, and Long seek reversal of their convictions on Counts 2 and 3 of the Superseding Indictment filed in the district court.

Appellant David Oiler seeks reversal of his conviction on Count 37 of the Superseding Indictment. Appellant Long seeks reversal of his conviction on Count 70 of the Superseding Indictment.

Appellant Carlos Hernandez seeks a remand for re-sentencing his sole count of conviction.

Respectfully submitted,

/s/ Joshua Snow Kendrick

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
Post Office Box 6938
Greenville, South Carolina  29606
(864) 760-4000

*Counsel for Appellant Long*

John D. Delgado
BLUESTEIN & NICHOLS, LLC
Post Office Box 7965
Columbia, South Carolina  29202
(803) 779-7599

*Counsel for Appellant Baker*

61

William M. Duncan
Austin & Rogers, PA
508 Hampton Street
Post Office Box 11716
Columbia, South Carolina  29201
(803) 256-4000

*Counsel for Appellant Oiler*

Cameron B. Littlejohn, Jr.
ATTORNEY AT LAW
1720 Main Street, Suite 202
Columbia, South Carolina  29201
(803) 799-1888

*Counsel for Appellant Hernandez*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*13,803*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [     ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [     ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].


Dated: February 14, 2014                    /s/ Joshua Snow Kendrick
                                            *Counsel for Appellant Long*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of February, 2014, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Julius N. Richardson
> OFFICE OF THE U.S. ATTORNEY
> 1441 Main Street, Suite 500
> Columbia, South Carolina  29201
> (803) 929-3136
>
> *Counsel for Appellee*

I further certify that on this 14th day of February, 2014, I caused the required copies of the Brief of Appellants and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volumes of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Joshua Snow Kendrick
*Counsel for Appellant Long*